Before STATE INDUSTRIAL BOARD, Respondent.

In the Matter of the Claim of ROSE BRISKIN, Respondent, for Compensation under the Workmen's Compensation Law, for Herself and Children, for the Death of BENJAMIN BRISKIN, *v.* MORRIS HYMAN, Employer, and the GENERAL ACCIDENT, FIRE AND LIFE ASSURANCE CORPORATION, LIMITED, Insurance Carrier, Appellants.

Third Department, November 15, 1922.

Workmen's Compensation Law — manager without prescribed hours of labor is not in course of employment at all times — decedent, employed in garage temporarily as manager without prescribed hours of labor, was sleeping there at night for his own convenience at time of fire causing his death — death did not arise out of and in course of employment.

A manager of a business who has no prescribed hours of labor is not in the course of his employment at all times, but only when his duties require him to be at his employer's place of business.

Accordingly, decedent did not suffer injuries arising out of and in the course of his employment, where it appeared that he was employed temporarily to act as manager of a garage during the absence of the general manager; that at the same time he was interested either as an employee or partner in an undertaking business conducted by the owner of the garage; that while there was some evidence to the effect that the regular manager visited the garage occasionally in the night time, he did not stay there during the night; that the decedent went to the garage in the night time and slept there for his own convenience and not as a part of

his duties; that there was a fire in the garage shortly after midnight and the decedent was burned so badly that he died during the day, and that prior to the decedent's employment as manager he had acted as nightman at the garage. HASBROUCK, J., dissents, with opinion.

APPEAL by the defendants, Morris Hyman and another, from a decision and award of the State Industrial Board, made on the 15th day of February, 1922.

*Alfred W. Meldon* [*Joseph Force Crater* of counsel], for the appellants.

*Charles D. Newton*, Attorney-General [*E. C. Aiken*, Deputy Attorney-General, of counsel], for the respondents.

HINMAN, J.:

The question here is whether or not the deceased employee met his death while in the course of his employment. His employer ran a garage and also an undertaking establishment. In the latter business the deceased had been a partner and at the time of his death was still connected with it as either partner or employee. The deceased had been a night man at the garage during the previous winter months in addition to engaging actively in the undertaking business. The son of the owner of the garage was the manager in full charge. The father attended to the undertaking business and did not interfere in the garage business at all. The son was ordered to the mountains for a few weeks for his health in May, 1921, and he employed the deceased to take his place as manager during his absence, to take care of the garage and sell goods. They had about fifty-five cars stored there and quite a supply of automobile accessories, gasoline, oil, etc.

About four nights after the son left, a fire occurred on the premises in which the deceased received burns resulting in his death. A policeman who saw the fire found the deceased at about two-fifty A. M., lying on the sidewalk burned from head to foot. The nightman, employed to wash cars and to have charge of the garage from eight P. M. to six or seven-thirty A. M., was awakened by the fire and escaped uninjured. He had not seen the deceased come in that night and did not know he was there. When he got outside, however, he saw a man on fire getting up from the office door. The policeman testifies that he questioned the deceased. He says: " I asked him what right he had in the garage — was he working there or what he was doing there, and he said he came to relieve another man, there was a negro in the garage, and I said: ' What time did you relieve this negro? ' and he said ' 6 o'clock,' and I asked him why he came so early and he said he was over that way and thought he would come in and sleep there, so he came in and

relieved him at six in the morning.   Q. Did he say anything about rather sleeping there than going home?   A. Yes, he said he would rather sleep there than go to Brooklyn and go home again, a matter of three hours " (probably meaning to The Bronx, where he lived, and back again to Brooklyn).

The deceased was taken in the ambulance to the hospital and died the same day, leaving a dependent widow, to whom an award has been granted.

The foregoing is all the testimony there is to show what the deceased was doing at the time and yet the State Industrial Board has found that " while engaged in the regular course of his employment a fire occurred in said garage which ignited his clothing * * * ; " that he " had no prescribed daily hours of labor, and, at the time he received said injuries, he was in his employer's public garage, working in the interest of his employer."

Is a manager always in the course of his employment because he has no specified hours?   This cannot be so.   Is he in the course of his employment merely because he happens to be at the place of business?   One can readily conceive of his presence there while engaged in a wholly different occupation or to serve a purely personal purpose.   The fact that the deceased was manager and privileged to be at the place of business all the time, if he desired, cannot be decisive of the question involved here.   We must find what his duties were, according to the circumstances disclosed. Certainly there can be no presumption that even a manager is in the course of his employment when asleep at night with no ostensible duty to be performed, occasioning his selection of the place of business as his sleeping quarters.   Whether he had any duty to perform or his sleeping at the garage was reasonably incident to his employment in the garage business, must be determined from the facts disclosed or reasonably to be inferred.

The son testified that the duties of the deceased were to take his place, that he expected Briskin to go to the garage " during the evening and during the night; " that " Briskin the winter previous to that was in my employ there for nights, so he knew all about it; " that the nightman had full charge at night but that he himself had had occasion to go there at times during the evening and during the night " so as to keep an eye on the nightman, he shouldn't use any of the cars; you know how it is in a garage — somebody will always come in and take somebody else's car out, so I had to go out there sometimes in the evening.   * * *   sometimes went to a show and when I come back from the show went down there, and sometimes for a rest about 1 or 2 o'clock also went down."   He further testified: " Q. And if you went down after the show or for rest,

how long did you stay? A. Oh, just to look around, and if I saw there was nobody there, but the nightman alone, I would leave again. * * * Q. Do you know, Mr. Hyman, whether or not Mr. Briskin had ever spent a night in the garage before coming to work for you, had he ever spent a night in the garage after he got done with the undertaking job? A. Yes, quite often. Q. Why did he spend the night there while working as an undertaker? A. Well, in the undertaking establishment there was jobs to be done quite often, like going to Central Islip or bringing a body from the mountains and returning early in the morning — he would go and spend the rest of the night in the garage. * * * Q. You mean on occasions before the fire Briskin had slept there in order to avoid coming to New York, because he had some night duties as an undertaker? A. Yes, sir." The night watchman testified that Briskin had slept there the Wednesday night prior to the night of the fire; that " he talked with me a little while and then went on to sleep."

The son does not indicate that there was anything connected with the garage business that ever required the deceased to stay at the garage all the time or to sleep there. The mere fact that he says he himself at times went there for a rest about one or two o'clock does not necessarily convey the idea that he went to sleep there or stayed all night or, even if he did so, that it was in further-ance of his employment. The deceased's right to sleep there was no part of his contract of employment in the garage, arising out of the necessities of his being employed sometimes at night in the undertaking business. The only fair hypothesis is that the use of the garage as a place to sleep arose out of a different employment and not as an incident of his garage employment. He was permitted by his employer to so use it. He was not required so to do. It was a matter of personal comfort and convenience to save him a long trip from Brooklyn to his home in The Bronx and to give him a longer sleep. This is the conclusion that is irresistibly drawn from the testimony as to what was expected of the deceased, as to the habits of the deceased, and as to what the son had done as manager, with which the deceased was familiar. The testimony of the policeman, as to what the deceased admitted to him, confirms this view. " He was over that way and thought he would come in and sleep there."

The conclusion of the referee of the Board appears to us to be an incongruity when he says that it was a most essential part of the deceased's duty to visit the garage at night in view of the fact that he found the nightman asleep on the night of the accident. Certainly if the interests of his employer required him to keep the

night watchman awake, he failed in his own duty by falling asleep himself without even arousing the watchman. According to such a theory, two sleeping night watchmen thus departed from their line of duty.

There is no evidence to support the finding of the State Industrial Board that at the time of the accident the deceased was " engaged in the regular course of his employment."

The award should be reversed and the claim dismissed, with costs against the State Industrial Board.

H. T. KELLOGG, Acting P. J., KILEY and VAN KIRK, JJ., concur; HASBROUCK, J., dissents.

HASBROUCK, J. (dissenting):

This is an appeal from an award of the State Industrial Board, made in favor of Rose Briskin, claimant, February 15, 1922, on a death claim.

Benjamin Briskin was a partner of Morris Hyman in the undertaking business at 81 Cook street in Brooklyn, and was assistant manager of a garage of said Hyman at 131 Cook street, Brooklyn. Briskin lived at 627 East One Hundred and Thirty-seventh street, The Bronx, New York. He had been employed upwards of three weeks as such assistant when the garage took fire and Briskin was so burned in the fire that he died May 21, 1921.

He took the place of the manager, Harris Hyman, the son of the owner, who was obliged to rest on account of his health and went away May seventeenth. Briskin's duties included seeing that the cars were properly placed, the oil supply kept up, that nothing was missing from the place. There were in the garage fifty-five cars, quite some loose supplies, rubber and gasoline. He had no authority to pay bills.

The fire took place about one-thirty in the morning and while Briskin was lying on the sidewalk he was discovered by White, a policeman, who testified: " I asked him what right he had in the garage — was he working there or what was he doing there, and he said he came to relieve another man, there was a negro in the garage, and I said 'What time did you relieve this negro?' and he said '6 o'clock' and I asked him why he came so early and he said he was over that way and thought he would come in and sleep there * * * he would rather sleep there than go * * * home again, a matter of three hours."

One of the objections of the appellants to this award is that the death did not arise out of and in the course of his employment.

The deceased was the person in charge of the garage with the duty of having some one there to guard the property and attend

to the business.   One of his duties was to relieve the nightman. In the performance of that duty it seems to me he had the right to be upon the premises and to occupy his time as he saw fit to accomplish the purpose of his employment.   He had the right to sleep there as a part of the responsibility of management.   His duty of superintendence was confined to no hours.   He was the boss to look after and direct the nightman and the boy.

It seems to me that the cases cited upon the appellants' brief tend rather to the support of the award than its overthrow.   Take *Matter of Daly* v. *Bates & Roberts* (224 N. Y. 126).   Judge Hogan of the Court of Appeals says:  " The injury must be received   *   *   * while the workman is doing the duty he is employed to perform." Measured by that test, Briskin met his death " in the course of his employment."   He was on duty as superintendent both in guarding the property from being stolen by thieves or from being used or suffered to be used by the employees and while waiting to relieve the nightman.

The case of *Matter of Gifford* v. *Patterson, Inc.* (222 N. Y. 4), was one where the duties were those of a watchman to go around the building for that purpose.   He went to sleep and slid down a chute and was killed.   This was the doing of an act not incident to his employment " and not authorized or induced by his employer in connection with his employment   *   *   *   within the meaning of subdivision 7, section 3 of the Workmen's Compensation Law."

In the case at bar the employment comprehended management and the relief of workmen and thus deceased was authorized in and induced to the act of staying and sleeping in the garage and the injury arose from the hazard of being so occupied in such an inflammable place.

Nor is the reasoning of Judge Collin in *Matter of Kowalek* v. *New York Consol. R. R. Co.* (229 N. Y. 494) conclusive upon the respondent, when he says: " The statute is not applicable to an injury which arises through a danger or hazard dissociated from or not inherent in the nature of the employment as its source and to which the employee would have been equally exposed apart from the employment.   *   *   *   An injury does not arise out of the employment unless the hazard causing it is, within rational apprehension, an attribute of or peculiar to the specific duties of the employment."

It must be apparent that hazard in carrying on a garage where there are gasoline and fifty-five automobiles is " within rational apprehension," for here the colored night watchman was forced to jump through a window to save himself from the conflagration.

The arguments of the appellants are based upon the claim that

Briskin was asleep there at one-thirty that night.  Nobody saw Briskin come in.  The evidence is that Holzendorf, the nightman, after he got out " saw a man on fire  *  *  *  saw him getting up from the office door."  The proof, therefore, rather is that the man was awake than asleep at the time of the fire.  The testimony of the policeman does not militate against the inference that Briskin was awake for it deals only with why he was at the garage.

The policeman does not represent him as saying he was asleep. He may have just come in.  At any rate he is entitled to the presumption that his claim falls within the provisions of subdivision 1 of section 21 of the Workmen's Compensation Law.  That presumption is rather strengthened than weakened by the evidence of the policeman and Holzendorf.

We think there is evidence to support the finding that his wages were to be forty dollars per week and that, therefore, the finding is final.

The award should be affirmed, with costs.

Award reversed and claim dismissed, with costs against the State Industrial Board.